The 4th District Appellate Court of the State of Illinois has now convened. The Honorable James A. Connick presiding. Ace, this afternoon at 1 o'clock is People of the State of Illinois v. Kevin Thornton, 4-18-0681. I would like for Council for Appellant to state your name for the record. Roxanna Mason, Your Honor. Thank you. And I would like Council for Appellant to please state your name for the record. Luca McNeil. And you may proceed. May it please the Court. My name is Roxanna Mason. I'm from the Office of the State Appellate Defender and I represent Mr. Thornton. Now, in the briefs we raised four issues and my intention today is to first concentrate on the first two issues because they kind of go together, the sufficiency issue and the prosecutorial misconduct issue. And then, if we have time, I would like to discuss the third and fourth issues, which both come down to matters of ineffective assistance of trial counsel, either in a standalone claim or as a crankled claim. Now, the first issue raised in this case I think is quite possibly the easiest to deal with. It's really the most straightforward, and that is that the State failed to prove Mr. Thornton guilty of armed violence beyond a reasonable doubt. And this is the case because the State failed to present evidence of an element. They failed to prove or present any evidence that an intimidation occurred in this case because they failed to prove that the victim, FN, did not consent to engaging in oral sex. The prosecutor repeatedly said that she had testified, that she said no, but no evidence was actually introduced that she said no. Now, in the briefs, the State has argued that the defense presented evidence that she said no. However, I feel that we touched on this in the reply brief. When the records look at as a whole, it becomes clear that that entire defense exhibit was never actually played for the jury. Only the very beginning portion that demonstrated that the victim was laughing when she was initially speaking with the police officer was played. The rest of it was not played, and in fact, that was part of the reason why Mr. Thornton believed that he had received an effective assistance of counsel. So, since that first count should be vacated outright, that really leaves us with the armed habitual criminal count. And that's where the other three arguments in our brief really come into play. The first of which has to do with the prosecutorial misconduct. And in starting to talk about the prosecutorial misconduct argument, I want to point out, Mr. McNeil did contact me earlier this week and told me that he would be addressing the Williams decision that this court recently released. It wasn't in the briefs, but he's informed me that he intends to do that. In terms of Williams, I don't think it really even comes into play in this case, because we're not talking about a type of prosecutorial misconduct in which there wasn't an intentional knowing act from the prosecutor. The state argues that the use of the phrase prosecutorial misconduct in this case is using it as a pejorative, but I kind of think the opposite is actually true here. It's not a pejorative. In this case, on these facts, it's really more of a euphemism, because if we're going to speak plainly about what happened here, the prosecutor lied. She lied repeatedly about evidence that she claimed she had presented, testimony she claimed had been given, that simply was not given at trial. Lying is misconduct. And this matters not just for the armed violence conviction. It also matters for the armed habitual conviction, because it really comes down to a credibility contest in this case. Do we believe FN's testimony, or do we believe the statements that were made by Mr. Thornton and recorded by police officers? And so credibility counts, and motive counts, and motive is part of credibility. So as I argued in the opening brief, if the jury was convinced by the prosecutor's arguments that this sort of sexual assault did occur, then that would be giving Mr. Thornton a reason to have the firearm and a reason to lie about it. Whereas absent that evidence, there's really not the same strong evidence of motive either to lie or to commit the offense outright. And this is particularly important here, where the victim did have a reason to lie about who had possessed the gun, because she herself was a convicted felon. And that brings me to the other two issues in this case that deal with ineffective assistance of trial counsel. And the first one deals with the failure of trial counsel to file a motion to sever. And we sort of have conflicting case law on this issue. Discussed in the briefs, we have the most recent decision in People v. Utley, and then we have older decisions from both this court and the First District in People v. Pool and People v. Fields. But when we look at the actual facts of the cases, there's not really a conflict, because in Pools and in Fields, the prejudice to the defendant was mitigated. In those cases, either first in Pool, you had a defense attorney who clearly was considering the prejudice of the offenses coming into trial and had even entered into a stipulation so that the jurors would only know that the defendant had a prior felony conviction, not the details of what those were. And then similarly in Fields, the prejudice was mitigated because the specific nature of the felonies in that case were not really tied to the charges that were on trial there. So you didn't have prejudice. So in light of those facts, it was a reasonable decision to pursue an all-or-nothing trial strategy. Here and in Utley, we don't have the same thing. And the facts here are frankly worse than the facts were in Utley, because counsel didn't just stipulate, oh, he has prior felony convictions, or, oh, he has these specific prior felony convictions. Instead, counsel stipulated that Mr. Thornton is a habitual criminal. Was the jury told what a habitual criminal is? No. In the definition? No. That's the interesting thing about this. Usually when there isn't a stipulation that the defendant is a habitual criminal, the jury would receive the jury instruction explaining in order to find him to be a habitual criminal, you have to find that he has these two qualifying prior felony convictions. And in most cases, there would be a stipulation that, yes, he has these two qualifying prior felony convictions. Here, since they stipulated that he's a habitual criminal, all that had to be decided was did he possess the firearm or not. And so we have that in light of the fact that the jury is told he's a habitual criminal. In this case that comes down to a credibility contest, the jury never had a chance to consider Mr. Thornton to be a credible witness or even really potentially innocent. And that brings me to the fourth issue in this case, the Krinkle issue, that brings up some evidence that may very well have proven Mr. Thornton's innocence in this case, but the trial counsel never investigated because trial counsel and the trial court in this case simply did not understand the rules of professional conduct. Now, Mr. Thornton was adamant that he had two witnesses, a Mr. Chad Wheeler and a Mr. Carcel Jackson, who were critical to his defense because their testimony could establish both that the complaining witness in this case was a habitual crack cocaine user and also that she had a history of making false allegations of sexual assaults. And trial counsel knew about these witnesses but never interviewed either one of them because trial counsel misunderstood the rules of professional conduct and thought that they were precluded from doing so simply because these people were represented by a public defender on a completely unrelated case. That's not the law. That's not what comment four on the rule of professional conduct 4.2 says. And yet that mistaken belief was the basis of trial counsel's conduct, the basis of trial counsel's decision not to investigate this exculpatory evidence, and unfortunately, the basis of the trial court's erroneous error as well. Now, we don't know exactly... I don't mean anything derogatory to you by asking this question, but have you done criminal defense work? Yes. Yes, I have. I was a trial attorney in the Ozarks for three years. Excellent. If I go to a defendant's lawyer and say, listen, I want to talk to your client about some drug use in a case I've got, and the lawyer says, I don't want you talking to my client. So you show up at the jail, and one of the first things they're going to ask you is, do you represent this guy? Say, no, but I've talked to his lawyer, and I need to talk to him. Did his lawyer tell you that you can talk to him? Well, no. In fact, his lawyer said that I can't talk to him. Do you really think you're going to get access to this client? I think if you're creative, you will, Your Honor, because there are ways around that. Wait a minute. If you're creative? Wait a minute. We're not talking about being creative. We're talking about the practicalities of getting in to see somebody else's client who is currently pending charges. When you know that his lawyer has told you, I don't want you talking to my client because I don't want him talking about drug use when he's got these other pending cases. So I'm trying to figure out just mechanically how you think you're even going to get in to speak to this in-custody defendant. Three ways, Your Honor. The first thing, I don't think that you actually necessarily have to speak with the individual's attorney beforehand. Now, here, counsel did. They're stuck with what that attorney said. I'm still backing up to the mechanics of it. What jail is going to let you in? I'm not sure where you came from, but here, where I'm from, I'm not going to get in the door and up to the visiting room when I tell the guy down at the front desk, well, I don't represent this guy. You're not going to get a confidential attorney-client visit, but what you can do is you can write Mr. Jackson or Mr. Wheeler a letter and say, I represent Mr. Thornton. Would you like to talk to me about this case? Can I come visit you on visiting day? You folks do things differently down in the Ozarks, because I'll just tell you right now, there is no place around here that's going to let you in to talk to somebody else's client, especially when they ask you, because one of the first questions is going to be, did you talk to his lawyer? Well, yeah, I did, and he says he doesn't want me to talk to him. Conversation's over. You can hold up the code of professional conduct all you want to that correctional officer, and he's going to tell you, I'm sorry, but unless you get me a court order, there is no way we're letting you in to talk to this guy. And when I read that in your brief, I was just stunned, because I thought, okay, perhaps this is someone who really hasn't done private criminal defense work before. Now hearing that you have, all I can assume is they do things dramatically differently in Missouri, because there's no jail around here. And I've been doing this. I was a criminal lawyer, either prosecutor or defense, for 25 years before 17 years on the bench. There is no jail that is going to let you in to talk to an incarcerated defendant when you are not the lawyer and you have to answer the question, did you talk to the lawyer? And they tell you, yeah, and he said he doesn't want me talking to him. I cannot fathom a jail that's going to let you in to talk to this individual. Your Honor, with all due respect, well, I agree that under normal attorney visit rules, that's absolutely the case. I believe that most jails in the state of Illinois, regardless of what part of the state we're in, allow visiting days, at least in non-COVID times, where moms and grandmas and sisters get to come in. Maybe it's just talking on the phone. Maybe it's through a video system. But visits are allowed. Incarcerated people are allowed to visit. Are you going to pretend to be a family member now? No. But I'm going to come to visiting day the same way that a friend or a colleague or anyone can visit an inmate. Are you on the list? If you're not on the list, you're not getting in. And that's why you write a letter to the person saying, will you put me on your visiting list if that's a particular jail's rules? And he's going to contact his lawyer and say, hey, am I supposed to talk to this guy? And the guy's going to say, no, I don't want you talking to him. Done. Maybe, maybe not. Fantasy. I'm just telling you, this is a fantasy argument that you are making. I have, I'm not criticizing any of the other arguments. I'm just telling you this particular part of your argument is a fantasy. I mean, in all fairness, your Honor, attorneys talk to incarcerated witnesses all the time. You might want to spend the rest of your time on something that's going to maybe make a difference because this one is not with me. Well, and I, I respectfully disagree your Honor, but I believe that attorneys have enough. Disagree all you want. It ain't going to happen. Not in any jurisdiction I've ever been around and I've practiced a lot around Illinois. I can't envision ever being able to allow him to talk to a defendant who is not my client. After I've been informed by the attorney, I don't want you talking to him. And that's also an opportunity there where if, if you did have a case where you had an obstinate jail that wouldn't allow this sort of basic investigative work to be done, that's where are you going to talk to your judge and tell the judge, I have this witness that I need to talk to. Can we arrange to have him brought over to the courthouse and sit down and in a jury room or some other free room and do an interview? We can even have the prosecutor there if your Honor would like. Counsel, I have a question. Was there any, was there any evidence that your client pointed the gun, a gun at the victim? No, there was no evidence presented at trial that he pointed a gun at the victim. And in fact, the victim herself even testified that he did not point the gun at her. Does the indictment specifically say that the intimidation occurred when your client pointed a gun at the victim? Yes. Well, is that a problem then? I think it's, it's in part a problem. Um, I was, we didn't raise that specifically as an issue in the briefs because I think that there is some argument that, you know, the state, that that might be a, an amount of surplus in the indictment itself, this precise way in which the intimidation occurred. If the state had actually presented evidence that intimidation occurred by him pulling the gun on her after she said no, could a reasonable jury infer that that's intimidation? Maybe. But here we don't even have that. So if, if it is required that that specific language in the indictment be met, that he pointed a gun at her, then absolutely they're not even close. That's my question. Is it required? Is the state, since they charge it that way, is it incumbent upon them to prove that that's what happened? I would like to say yes. I think that reasonable people could disagree on that and we don't have a lot of case law on the specific intimidation statute. I think that since that's the way that it was charged, then yes, the state should be held to that burden because that's what, you know, Mr. Thornton prepared a defense based on, but I think reasonable people could argue that it's an, it would have been enough if the state had presented evidence of some other form of intimidation based on trying to obtain the same result in this case, the sexual activities. Well, the state could have charged the defendant with just having displayed the gun instead of pointing the gun at the victim, right? Yes. All right. But you don't seem to think that's a problem. So move on. I mean, I, I think, I think there is a problem with it, but I think that reasonable people could disagree about whether it's a problem. I mean, ideally, yes, the state would have proven what they charged. I'm not talking about reasonable people here. I'm talking about from a legal standpoint, but I accept that you don't seem to think it's a problem. But either way, regardless, they didn't, they did not prove, I don't think it's enough for them to just show that he displayed the firearm. They, they have to show that he displayed the firearm and that he did so to get her to do something against her will. Let me ask you this question. Is there any problem with the one act one crime? No, I can't think of the word, but is there a problem with one act one crime in the sense that the intimidation, uh, involved pointing the gun and the armed violence was just the fact that he had the gun. Is that, is that a problem at all? Because it seems like to me, it could be, it seems like it could be the same act is used for the intimidation. And then it's used also, uh, for the armed violence, but you didn't argue that. So. Well, I think for the, for the armed violence and in the way it was charged, there, there are two acts essentially. Are you saying a problem with one act one crime? Are you asking about a problem between the armed habitual criminal and armed violence in one act, one crime? Well, when I read through the briefs, it popped into my head. This could be a one act, one crime, uh, problem for the state, but maybe it isn't. And I'm just asking, I, I actually don't have a preconceived notion of whether it is or it isn't. It just was a red flag for me as I read through the briefs. Yeah. And thinking about that now, I think there, there could be a one act, one crime problem in terms of since the only thing that the state proved across the board was, or at least presented evidence of across the board, it's disputed, but the evidence of was the possession and display of the gun. I see I'm out of time to briefly respond. Um, since we're out of time, um, it was just the display of the gun. Then yes, if the court does find that that was sufficient evidence, just the display of the gun, then I think there would be a one act, one crime problem. If there are no further questions. Thank you, counsel. We'll hear from you on rebuttal. May it please the court. Can you hear me? Yes. Uh, intimidation as a justice Turner was talking about, that wasn't specifically charged in this case. He wasn't found guilty of it. He was, it was just an element of the armed violence charge. The two charges he was convicted of were armed violence and, and armed habitual criminal. Okay. Well, let me stop you there. He was not found guilty of intimidation. I thought he was found guilty but he was only sentenced on the armed violence. It was an element as charged of the armed violence. Correct. It would have to be, there has to be another felony. You got the gun and you commit a felony. So the felony was the intimidation. So it's the predicate felony of the armed violence. Correct. Um, I can't, I tried to find the, uh, Charging instrument and I, I couldn't do it. Um, but anyway, I think I have the right one. It's a bill of indictment and it says in that the defendant normally with the gun on him communicated in person to FN a threat to without lawful authority use force against FN in that he pointed a firearm at FN. Okay. That's an act. Is it, is, did you use the same act for the armed violence? I was reading from the intimidation charge. I would, I mean, again, the, the, there would be an extra element of, uh, of, uh, putting the firearm in that context, which would not be, uh, not be exist. We wouldn't be required for the intimidation or the, uh, armed violence charge. To me, it just seems like it could be a problem, but maybe not. Maybe I'm reading something into this that doesn't exist. I frankly don't know. So those are both good questions. I've, I would love to point to the rule that OSAD loves to cite these days. Rule three 41 H. Um, these, these arguments were not argued at all in this brief. So they are, they are clearly forfeited. Um, I understand that. Let me move on from that then though. The charge does say that, um, the defendant pointed a gun at the victim. And yet I guess there was no testimony about that. Is that a problem for the state? There was sufficient, this, this charging instrument gave him sufficient notice as to what the charge was. This was not a con he didn't contest that he didn't point the gun at FN. His point, his defense theory was that FN was making all of this up. So it, even if we presume, uh, a problem in the charging instrument, the defendant clearly was not prejudiced by that. Um, I thought the state proved the threat because there was no verbal threat. I thought the state proved the threat by arguing that he pointed the gun at the victim. He, they argued that he brought the gun out, placed it next to his penis. And there's evidence of FN stating that he cocked the gun and evidence of his argument. So that is, especially when looking at this evidence of the light most favorable to the prosecution that satisfies the elements of armed violence. Um, specifically, I want to talk about that video, uh, page three 24 of the record. Counsel stated that he's going to start the video. This is the video of the police officer questioning FN in the back of the car. He says, he's going to start the video at 10 hours, seven minutes, 42 seconds. FN stated that she said no to defend his request for oral art or for oral sex less than one minute after that. This is important because counsel's questions to the police officer directly after this were about contents of the video way after FN stated this. No. Um, on again, starting on page three 24 defense counsel says as part of your investigation, you got a statement from her asked her what happened. Correct. Correct. As part of that Miss Nesby told you what happened up to the point that the police arrived. Correct. And she told you that after she locked out, Mr. Thornton, she called her brother. Didn't she? Correct. She didn't say anything about calling her cousin. No, she told me she called her brother. This conversation about whether she called her brother or cousin, she testified, she called her cousin in the police car. She stated that she called her brother. This part of the video was way after she had already narrated what defendant did with the gun. And that she stated, no, this was, there's no way to presume that defendant, that defense counsel only played like the first few seconds of this video when the content of the questioning concerned parts of the video way after she stated no. So there was evidence presented that she stated no. Um, and of course, defense count, or the prosecutor was not improper in failing to bring that up. As, as for Williams, I know justice Turner, you, um, drafted a special concurrence and Williams specifically disagreeing with the part of justice Steigman's, um, discussion on prosecutorial misconduct, uh, where he stated he wishes to delineate prosecutorial misconduct from mere error. Um, it doesn't really apply in this case too much, but this is my latest hill to die on that. The term prosecutorial mix misconduct should not be, uh, used in situations like this, where of course there was no error here, but say the prosecutor does, uh, fail to recollect exactly how a witness testifies in this closing argument or inadvertent mistakes that happen at the speed of trial. Um, there, those are not called you. Those are not called judicial misconduct when the trial court fails to admit a, uh, something that's hearsay or, uh, another evidentiary error. That's called judicial error. It's not called attorney misconduct when a defense counsel, uh, fails to, uh, uh, interview witnesses or whatever. It's called ineffective assistance to counsel. The term is conduct in the way. It's a commonly used suggests intentional or willful malice, which is why it was used in the, basically in the grand jury, the intentional misconduct in the grand jury, uh, perspective for so long, uh, that another, again, I think Justice Steinman was correct where he mentioned Brady or Batson violations as something that could fall under the term prosecutorial misconduct, not simply, um, maybe asking an improper question during cross-examination or misstating, uh, an evidentiary standard or, uh, misstating the evidence in, in closing argument. Uh, again here, this doesn't really apply because as I stated, there's nothing, there's no way to rebut the presumption that this video was played at least for less than a minute. Um, starting on page three 24 of the record based on defense counsel's questions. And this makes complete sense because again, defense counsel, this was never a point of contention at trial that FN was telling the truth that, but she just didn't sufficiently convey her rejection to defendants request for oral sex. This was not the point. Uh, this was not the defense theory at trial. So it makes sense that counsel wanted to point out the defense theory was that FN was completely making all of this up to cover, cover herself, because she was a felon as well. And the gun, uh, could presumably belong to her. Um, so the inconsistencies about calling her cousin or calling her brother or whatever, that makes sense for defense counsel to try to bring, elicit those based on FN's inconsistencies in her trial testimony. But it does not mean that the part of the video where she says no was not played before the jury. And of course, the prosecutor was allowed to comment on that in closing argument. Um, as for the ineffective assistance of, uh, counsel arguments, um, as, as justice Kavanaugh's discussed, it's not really realistic for, for counsel to go to these great lengths to try to interview these witnesses mainly because even if they were going to testify exactly as defendant alleged, there's zero relevance to what they were going to testify to. They weren't going to testify that they smoked crack with FN the day of, or right before this incident happened, they were going to testify that they use drugs with FN months or even years in the past. This is completely irrelevant. And not only that, if we assume the hypothetical, the, at, at the very least, even if he did discuss this with these and attempted to get these people to testify, their counsel is going to advise them not to testify, not to incriminate themselves, uh, to, to damage their prior, or to damage their pending charges. So even if we take it that they somehow made that counsel somehow made contact with these witnesses, there's absolutely no way they were going to trial. And even if they somehow were, uh, potential witnesses, the trial court would ban it based on relevance anyway. So, um, but the point of that is that it was not manifest error for the trial court to assume or to not appoint additional counsel at Crankle, which is the standard here. Counsel heard the explanation and correctly found that, uh, defend, defendants defense counsel's strategy was sound. Um, as for the motion to sever, this court stated in pool, cited in my brief that a defense decision not to seek a severance, although it may prove unwise in hindsight is regarded as a matter of trial strategy. Of course, matters of trial strategy can't, uh, can't support the ineffective assistance argument. And I think that the Utley decision was Utley decision takes that presumption and throws it out the window. And I think it was wrongly decided. Although in this case,  it was a strategic decision. This wasn't him simply neglecting to consider severing these charges. He filed. What was the strategy? An all or nothing strategy. There's, and this makes sense with their, they presumed that the, and again, hindsight is always 2020, but they presumed that a jury would not believe FN's testimony. If they did not believe FN story, he's acquitted of both charges. If they, um, and that was, that was the, uh, plan. And this was shown in the demotion and lemony and the stipulation that the prosecutor and a defense counsel stated that he would only be called, he would only be stipulated to a habitual criminal, not the offenses that, that, uh, made him a habitual criminal. And I know. So defense counsel would have rather the jury to know that defendant was a habitual criminal as compared to twice been convicted of unlawful delivery of a controlled substance, given the facts of this case where he's he purportedly has a handgun. That was the strategy. I can't fathom how defense counsel came up with that stipulation as a sound way to proceed on behalf of his client. I mean, they're only discussing one, um, crime instead of the multiple offenses that would have to be convicted for habitual criminal. But counsel, can you imagine what the jury without any definition of what a habitual criminal, what they're thinking? They're thinking, Oh my God, he's a habitual criminal. They discuss the elements of armed habitual criminal in closing arguments. So the jury was well aware that this was not a chart. This was a legal term. This was not just somebody labeling him, uh, that label. I wasn't aware of that in the sense that they said he's been twice convicted of, uh, felonies prior to this case, but they don't know the jury what the felonies are. They stipulate that he was a habitual criminal. And then the prosecutor discusses, uh, what, what the elements of armed habitual criminal are. So again, I don't think the jury, the jury couldn't, they weren't just called, they didn't call defendant a bad guy. They were, they were saying this was a legal term. This was a legal offense that defendant was guilty of, and they didn't go into the specific offenses, uh, underlying offenses. And I think that was reasonable trial strategy. Again, uh, of course that specific argument was not made. This was more of a motion to seek a severance, not just the, uh, the terminology used in this specific case. Um, it should not, the defendant fails to overcome the presumption that this was a matter of trial strategy and all or nothing matter of trial strategy based on FNs in credibility of her trial testimony and her inconsistencies between the two stories she alleges. So, um, this was not the, at least the defendant has failed to overcome that presumption that this was a matter of trial strategy. And, um, therefore there was no ineffective assistance to counsel again, based on the fact that there was a stipulation, there was a motion to eliminate prior to trial. This shows or suggests that at least it was considered to sever these, these two, um, offenses and it was decided not to. Okay. Um, if the trial court has no more questions, I would ask to a form appellate court. Sorry. I see no more questions. Thank you. There's Mason. We'll hear from you on rebuttal. Sure. May it please the court. Just a couple of very quick issues. Um, I wanted to touch on something Mr. McNeil discussed with regards to whether the video of FN's pre-trial statement was actually played in its entirety. Um, one thing that the state did not address, I had hoped they would address today, but they did not, was the post-trial discussion of this where Mr. Thornton alleged trial counsel was ineffective for not playing the video. Trial counsel explained why he did not play the video. And then the trial judge found that it was not ineffective assistance for trial counsel to not play that video. And what of all this is pretty much irrefutable evidence that the video was not played in its entirety. Let me ask you a question. Would it be correct that FN testified that as she ran and took off toward the back door that the defendant pursued her and grabbed her and she said, no, no, no. At that time, was that her testimony? That's part of her testimony. Well, that's uses the word no, which could be construed to mean you're not going to drag me back into the living room or the bedroom or wherever it was, or it could be, no, I'm not going to do what you want to do. Is that a reasonable inference to draw from what she says occurred? She removed his shirt and he's sitting there naked with a gun. And apparently there's a reference in the testimony that she heard the gun cop and then she uses the words, no, no, no. She's trying to get away from me and is successful in doing so. What did those no's mean? I think that the order here is incredibly important because what happens is they're engaged in the consensual sexual activities. She gets up to go get a drink. Allegedly after he requests oral sex, she gets up, goes to get a drink, comes back. She re-instigates the sexual activities, removing the piece of clothing from his general area and revealing the gun while she says some suggestive things to him. She sees the gun at that point. Suggestive things are simply, you don't need to hide it. I've already seen it. That's not necessarily suggestive. That's a statement of fact. What's the deal with putting the shirt over your lap? And then she's shocked to see that he's got a gun. And she indicates that she's shocked. She says something like, oh my God, or oh Jesus. When she sees the gun. She clearly was not interested in introducing the firearm into their sexual activities. When she sees that. Okay. That's, that's the inference you raise in your brief. This bizarre argument that maybe this was some sort of a fetish or something. And for you, that's apparently a more reasonable analysis than the conclusion of the jury that no, it looked like that was a threat because she ran away. He grabs her by the neck and she just keeps screaming, no, no, no, no. Until she's finally able to maneuver him out the door. Because we have to look at all the facts, not just some of the facts. What's the standard of review? If you can come up with any other argument, then that's sufficient to overturn the jury's verdict. Is that what you're saying? No, we have to look at the evidence that was presented. And even in the light most favorable to the state, the evidence that was presented here does not establish that there was intimidation because that's what it all comes back to is, did he do something to have some threat of physical violence against her to try to force her to do something against her will? Again, there's no evidence that she said no to the oral sex. She comes back. She reinitiates sexual activity by removing clothing from him. At that point, she sees the gun. She gets scared. She backs away. You claim prosecutorial misconduct for simply arguing no in a context you don't agree with. And yet you also stand here and claim that this victim has reinitiated sexual contact in the testimony that's presented in the transcript. That's as much of a misrepresentation as what you allege against the prosecutor. He removed the article of clothing that was covering his genitals and said that he didn't have to hide it, that she's already seen it. First she says, you don't have to hide it. I've already seen it. Then she removes the shirt and realizes that he's sitting there holding a gun. That's when she tries to get away from him. And then when he grabs her by the neck, she screams, no, no, no. That's not reinitiating sexual contact. I guess I just find it somewhat interesting that you allege misconduct on the part of the prosecutor in the nature of his argument, and yet you misrepresent to just a significant degree what the evidence was in your argument. Is that misconduct? I see that I'm out of time. Can I respond to your Honor's question? You may. I have not misrepresented a single fact in this case. That's my point. It's merely argument. You call it prosecutorial misconduct. It's just argument. No, it's when the no happened is what matters. She did not say no to oral sex. The State's theory is that she said no to oral sex. He pulled out a gun. That was a threat, because she had said no to the oral sex. She never said no. She never said no to the oral sex. She did not say no until after the gun came out. Thank you. That is a critical difference. You've made your point. Thank you. We'll take this matter under advice.